IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DE SHAWN DRUMGO, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 12-1204-GMS |
| ANTHONY BURRIS, et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM**

**I. INTRODUCTION**

The plaintiff De Shawn Drumgo ("Drumgo") is an inmate at James T. Vaughn Correctional Center ("JTVCC"). He filed this *pro se* action on September 25, 2012, against a number of JTVCC corrections officers and employees (collectively, "State Defendants").[1] (D.I. 3.) To date, Drumgo's remaining claims against the State Defendants are: unconstitutional conditions of confinement ("Count I"), excessive force and retaliation ("Counts III & IV"), and unconstitutional strip searches ("Count V").[2] Presently before the court is the State Defendants' Motion for Summary Judgment (D.I. 81) and Drumgo's Motion to Amend the Complaint. (D.I. 95.) For the reasons that follow, the court will grant the State Defendants' motion for summary judgment and deny Drumgo's motion to amend as moot.

---

[1] The remaining defendants are Officers Totimeh ("Totimeh"), Benson-Williams ("Benson-Williams"), Willey ("Willey"), Thode ("Thode"), Roop ("Roop"), Fritsch ("Fritsch"), Burris ("Burris"), McClain ("McClain"), Gattis ("Gattis"), Young ("Young"), Warnick ("Warnick"), and Warden David Pierce ("Pierce"). Drumgo's motion to amend the complaint seeks to name Officer Turner ("Turner") as an additional defendant. (D.I. 95.)

[2] The court uses the numbering system from Drumgo's original complaint in order to remain consistent with the parties' briefing.

## II. BACKGROUND

The facts alleged in Drumgo's complaint (and its amendment) have been detailed in the court's previous writings. The court will attempt to provide only the facts necessary address the instant motion. The following are four distinct factual scenarios.

On March 18, 2010, Drumgo's cellmate threw a milk carton containing fecal matter at a corrections officer. (D.I. 82, Ex. A at A02.) On March 25, 2010, Drumgo filed a grievance that the mess of feces on the cellblock floor still had not been properly cleaned. (*Id.* at A01.) Drumgo complained that his bagged meals were passed over the contaminated area, which he thought posed a health hazard. (*Id.* at A01, A05) Fritsch investigated the grievance and found no evidence that fecal matter remained on the tier: a week passed between the initial incident and Drumgo's filing of the grievance—the equivalent of eighteen meals. (*Id.* at A02.) Drumgo, however, was reportedly displeased with the manner in which the area was cleaned. (*Id.*) Log books indicated that the tier had been cleaned on at least two occasions in the interim. (*Id.* at A34, A36.) Fritsch's determination was upheld on appeal. (*Id.* at A04–A08.)

On July 16, 2010, Officers Benson-Williams, Warnick, Young, and Turner attempted to conduct a random "shakedown" of Drumgo's cell to search for contraband. (*Id.* at A09.) Drumgo refused to "cuff up," explaining that a lieutenant had to be present for shakedowns of his cell because he believed the search was aimed at seizing his legal materials. (*Id.*; D.I. 83 at 7.) After confirming that a lieutenant was not required to be present, the officers again ordered Drumgo to cuff up. (D.I. 82, Ex. A at A09.) The parties dispute what happened next. Reports from Benson-Williams and Young state that Drumgo wrapped a t-shirt around his face and approached the officers, swinging his arms in a threatening manner. (*Id.* A09, A11.) Drumgo maintains that he attempted to show the officers paperwork concerning shakedowns. (D.I. 83 at 7.) In any event,

2

Drumgo did not immediately comply with the officers' order, and Benson-Williams "capstunned" (*i.e.*, pepper sprayed) Drumgo's cell and closed the door.³ (D.I. 82, Ex. A at A09.) A nurse treated Drumgo for the effects of the capstun, and he was placed in isolation pending a hearing for the incident. (*Id.* at A13.)

On June 5, 2011, Burris transferred Drumgo to a new cell on B tier because C tier had experienced flooding. (*Id.* at A15, A18.) Burris' report states that Drumgo was strip searched upon reaching the new cell, whereupon he discovered contraband on Drumgo's person: a heating device or "stinger." (*Id.* at A18.) Drumgo submitted a grievance that, during the transfer, Burris had damaged and taken Drumgo's sneakers. (*Id.* at A22.) In his sworn brief, however, Drumgo also contends that Burris shoved Drumgo into a fence and harshly twisted his cuffs, causing Burris to suffer a chipped tooth, a busted lip, and lacerations on his wrists. (D.I. 83 at 5, 10–11.)

Drumgo contends that, between August and September 2011, McClain would strip search Drumgo three times a day and destroy Drumgo's legal materials.⁴ (D.I. 83 at 9.) Drumgo apparently had complained about McClain previously. (*Id.*) Drumgo asserts that Gattis' inadequate supervision caused this unconstitutional conduct to continue. (D.I. 83 at 9.) Incident reports show that, during the relevant time period, Drumgo was caught passing contraband using a "fishing line." (D.I. 82 at A38.)

---

³ Drumgo also provides the sworn statement of Antonio Fletcher, another inmate, that Benson-Williams' use of capstun was unprovoked and that he had only been trying to present the officers with documentation. (D.I. 83, Ex. B.) Mr. Fletcher observed the incident "thr[ough] the side of [his] door." (*Id.*)

⁴ Drumgo includes the statements of several other inmates, who also were apparently subjected to the strip searches. (D.I. 83, Ex. A.) These statements, however, were "sworn" in September 2014, and appear to concern conduct (*i.e.*, searches) that took place in the summer of 2014.

## III. STANDARD OF REVIEW

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). There is a genuine issue "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* When determining whether a genuine issue of material fact exists, the district court must view the evidence in a light most favorable to the nonmoving party and draw inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citing Fed. R. Civ. P. 56(e)).

The pleadings of *pro se* plaintiffs are generally held to "less stringent standards" than those of represented parties. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A *pro se* plaintiff still has "the formidable task of avoiding summary judgment by producing evidence 'such that a reasonable jury could return a verdict for [him].'" See *Zilich v. Lucht*, 981 F.2d 694, 696 (3d Cir. 1992) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court will not recognize a genuine dispute of material fact solely on unsubstantiated allegations in the complaint. See *Harp v. Rahme*, 984 F.

Supp. 2d 398, 409 (E.D. Pa. 2013) ("Plaintiff's *pro se* status does not eliminate her obligation to allege specific facts, substantiated by evidence on the record.")

### B. Amendment of Pleadings

The court is to "freely give leave" to parties to amend their pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave to amend must generally be granted unless equitable considerations render it otherwise unjust. Among the factors that may justify denial of leave to amend are undue delay, bad faith, and futility." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006).

## IV. DISCUSSION

The State Defendants contend that, based on the available evidence of record, each of Drumgo's claims fail as a matter of law.

### A. Count I

The Eighth Amendment of the U.S. Constitution protects those convicted of crimes from "cruel and unusual punishment." U.S. Const. amend. VIII. "Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. . . . To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ("[E]xtreme deprivations are required to make out a conditions-of-confinement claim. . . . [R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society . . . ." (internal quotation marks omitted)). Thus, in evaluating whether the conditions of confinement pass constitutional muster, the court must consider both an objective component—"Was the deprivation sufficiently serious?"—and a subjective component—"Did the

5

officials act with a sufficiently culpable state of mind?" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The objective prong requires that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). As for the subjective prong, a prison official's *inadvertent* failure to remedy a wrong is not actionable; he or she must demonstrate "deliberate indifference" to inmate health and safety. *Id.*

The court finds that Drumgo cannot satisfy either prong. The evidence does show that fecal matter was thrown onto the tier floor from Drumgo's cell. Drumgo protested the fact that his food was passed over the contaminated area, stating that it was "gross." (D.I. 82, Ex. A at A01.) But the log books confirm that cleaning crews cleaned the tier on at least two occasions between the date of the incident and the date of Drumgo's first grievance. And Drumgo even acknowledged that the tier was in fact cleaned; he objected, however, to the manner in which the prison staff cleaned the area. Beyond his bare assertions that the cleanup job was not done right, there is no evidence that whatever contamination may have remained was "sufficiently serious" to implicate Eight Amendment concerns. *See Wilson*, 501 U.S. at 298 ("The Constitution . . . does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." (internal citations and quotation marks omitted)).

The record is also entirely devoid of evidence that would support an inference of deliberate indifference, *i.e.*, the State Defendants "disregard[ed] a risk of harm of which [they were] aware." *See Farmer*, 511 U.S. at 837. Drumgo himself did not file a grievance for a full week after the incident, marking the first and only evidence that State Defendants were put on notice of a possible concern. Fritsch thereafter investigated the grievance and found no evidence that Drumgo's

complaint had not already been addressed. In other words, the evidence fails to indicate (1) what the risk was and (2) whether the State Defendants knew of it. There is no genuine dispute for trial concerning the State Defendants' deliberate indifference. Summary judgment on Count I is appropriate.

## B. Count III

### 1. Excessive Force

Like conditions of confinement claims, excessive force claims also arise under the Eighth Amendment. The analysis, however, is quite different. *See Hudson*, 503 U.S. at 8 ("[The] application of the deliberate indifference standard is inappropriate when authorities use force to put down a prison disturbance."). "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7 (citing *Whitley*, 475 U.S. 312). Courts evaluate the following factors to determine whether a defendant's use of force was excessive and in violation of the Eight Amendment: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley*, 475 U.S. at 321); *Freeman v. Dep't of Corrections*, 447 F. App'x 385, 389 (3d Cir. 2011).

In light of the various *Whitley* factors and the available evidence, the court finds that it would be impossible for Drumgo to satisfy his burden at trial. The exact factual circumstances are controverted, but the disputes are not material. *See Lamont*, 637 F.3d at 181. Drumgo acknowledged that he refused to comply with the officers' numerous orders to cuff up and that he

ultimately approached the officers. Benson-Williams' use of capstun was therefore not an immediate response to Drumgo's noncompliance. In his version of events, Drumgo contends that he was not deliberately stalling but, rather, was attempting to provide the officers with documents showing that a lieutenant was required to be present for shakedowns; these documents, however, are not part of the record. Drumgo also has produced no evidence that the capstun caused injury beyond temporary incapacitation, which was treated by a nurse. While it does not doubt that the experience was unpleasant, the court cannot say that the use of force was so excessive that it gave rise to a Constitutional violation. The evidence simply does not permit an inference that the officers' force was applied "maliciously or sadistically to cause harm."[5] *See Hudson*, 503 U.S. at 7.

### 2. First Amendment Retaliation

Drumgo also contends that the officers' shakedown of his cell was retaliation for his previously filed civil suits. "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *White v. Napoleon*, 897 F.2d 103, 111–12 (3d Cir. 1990). Proof of a retaliation claim requires the plaintiff to demonstrate (1) he engaged in protected activity; (2) the retaliatory action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link exists between the protected conduct and the retaliatory action. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The Third Circuit has stated that "[g]overnment actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated

---

[5] The court reaches the same conclusion, taking into account the apparent "sworn" statement of Mr. Fletcher. *See supra* note 3. The statement is dated July 22, 2010, a week after the incident and more than two years before the filing of this lawsuit. Drumgo would have had to display incredible foresight to obtain this statement at the time. Even assuming the legitimacy of the statement, the court finds that it does not create a genuine dispute of fact. It corroborates the fact that Drumgo was noncompliant.

8

in substantial part by a desire to punish an individual for exercise of a constitutional right." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). Claims of unconstitutional retaliation, however, must be evaluated critically, as they are "fraught with the potential for abuse." *See Blizzard v. Hastings*, 886 F. Supp. 405, 409 (D. Del. 1995).

Drumgo fails to show that the alleged retaliatory action—the shakedown—would dissuade someone from exercising his constitutional rights, or that it was causally connected to his lawsuits. Cell searches are an ordinary part of life for prison inmates. Drumgo does contend that this incident—something that prisoners face regularly—discouraged him from engaging in his protected activity or would discourage a fellow inmate. Indeed, Drumgo's continued filings with the court demonstrate that he was anything but discouraged. Moreover, the record fails to support an inference of causation:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation.

*DeFlaminis*, 480 F.3d at 267. The only evidence of record are Drumgo's own statements from his brief. But he fails to include any details concerning the timing of events or a history of antagonism. In fact, the only mention of possible retaliation is that non-party Lieutenant Karen Hawkins was a defendant in one of Drumgo's other lawsuits and wanted to seize his legal materials. (D.I. 83 at 7.) This does not demonstrate antagonism on the part of the actual named State Defendants in this case. As the record has almost nothing to say about Drumgo's retaliation claim, there can be no basis to infer causation "from the record as a whole." *DeFlaminis*, 480 F.3d 259.

Summary judgment on Count III—both the excessive force and the retaliation components—is proper.

### 3. Amending Complaint

Drumgo seeks to add Turner as a defendant for his role in the shakedown incident. As explained above, while leave to amend is ordinarily freely granted, "undue delay, bad faith, and futility" may justify denial of leave. The court entered a scheduling order on January 14, 2014. (D.I. 58.) It set a deadline for joinder of parties of March 14, 2014. Drumgo did not seek to add Turner until June 10, 2015. (D.I. 95.) Drumgo's amendment is untimely and without justification, but more important, it is futile. The court is granting summary judgment on Count III, rendering Drumgo's motion moot.

### C. Count IV – Excessive Force

The court already outlined the standard for excessive force claims. An obvious element of an excessive force claim is the actual application of force. Drumgo contends that, during a cell transfer, Burris shoved him and twisted his handcuffs. These actions apparently resulted in a chipped tooth, a busted lip, and lacerations to his wrists. But the only evidence of these injuries is Drumgo's brief, which merely repeats the allegations of his complaint. Importantly, Drumgo filed a grievance after the event actually occurred: in it Drumgo only complained that Burris had damaged his sneakers and had taken the insoles. (D.I. 82, Ex. A. at A22.) The grievance fails to make any mention of injury or Burris physically abusing Drumgo. (*Id.*)

Drumgo cannot generate a genuine dispute of material fact with "sworn" statements in his brief. While not directly on point given the dearth of evidence, the "sham affidavit" doctrine guides the court's reasoning. *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) ("[A] sham affidavit cannot raise a genuine issue of fact because it is merely a variance from

10

earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant."). Drumgo's brief (which the court, for the purposes of summary judgment, treats as an affidavit) provides facts that were never included in Drumgo's own grievance or the incident report submitted by Burris. Drumgo fails to produce any medical records of treatment he may have received for his injuries. In other words, the only evidentiary support for these injuries comes from Drumgo's brief, submitted over three years after the incident. "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." *Jiminez*, 503 F.3d at 253.

Drumgo contends that the State Defendants' motion for summary judgment is premature because he has not yet conducted any discovery of his own. But the court's scheduling order set a deadline for close of discovery of July 14, 2014, with case dispositive motions due September 15, 2014. (D.I. 58.) Thus, the State Defendants' motion is procedurally proper. And Drumgo's failure to seek discovery or request an extension is not an impediment to ruling on the State Defendants' motion. The record fails to support an inference that Drumgo indeed suffered the alleged harm, and therefore there is no basis for Drumgo's excessive force claim against Burris.[6]

---

[6] Even if the court were to credit the statements in Drumgo's brief, he would run into an exhaustion problem because, as already stated, his grievance plainly did not include any mention of physical injury. *See* 42 U.S.C. § 1997e(a) (requiring inmates to exhaust prison administrative remedies before filing a federal lawsuit); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("The [Prisoner Litigation Reform Act] exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). The facts contained in Drumgo's complaint and those in his grievance are not sufficiently similar to satisfy the exhaustion requirement. *See Bredbenner v. Malloy*, 925 F. Supp. 2d 649, 658 (D. Del. 2013) ("Perfect overlap between the grievance and a complaint is not required by the PLRA as long as there is a shared factual basis between the two.").

## D. Count V – Unconstitutional Searches

Drumgo contends that McClain repeatedly subjected him to strip searches as a form of harassment and that Gattis failed to properly supervise McClain. Although the precise basis for Drumgo's constitutional objection is unclear, the claims fail under any theory.

First, as the State Defendants point out, there is no evidence that Drumgo satisfied his exhaustion requirements under 42 U.S.C. § 1997e(a). *See supra* note 6. Drumgo fails to address this procedural defect in his brief. Summary judgment is appropriate where an inmate fails to exhaust his administrative remedies. *See Bickel v. Miller*, 446 F. App'x 409, 412 (3d Cir. 2011) ("Summary judgment was appropriate here because [plaintiff] failed to come forward with any evidence to rebut the defendants' showing that he failed to complete all steps of the grievance process with respect to the majority of his claims.").

Drumgo's claims also fail on the substance. To the extent that Drumgo argues that the searches were a form a retaliation, he has not provided sufficient evidence to demonstrate that the searches would have had a chilling effect or that they were causally connected to his complaints against McClain. *See DeFlaminis*, 480 F.3d at 267. To the extent that Drumgo contends that the searches amounted to cruel and unusual punishment under the Eighth Amendment, the court sees no evidence that he was harmed or that he was deprived the "minimal civilized measure of life's necessities." *See Farmer*, 511 U.S. at 834. Moreover, in the Fourth Amendment context, "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities. The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1517 (2012) (internal citation and quotation marks omitted). Therefore, "in the

absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Id.* (internal quotation marks omitted). The record contains little evidence of the searches aside from Drumgo's own recollection[7]—this cannot support an inference that the prison's response was "exaggerated," especially in light of incident reports showing that Drumgo was caught with contraband during the relevant time period. (D.I. 82, Ex. A at A38.)

Finally, Drumgo's claim against Gattis is premised on supervisor liability.

> A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Drumgo has not substantiated his claims against Gattis with any evidence of his participation, knowledge, or acquiescence.

Summary judgment for Count V is appropriate.

## V. CONCLUSION

For all of the above reasons, the court grants the State Defendants' motion for summary judgment (D.I. 81) on all remaining claims.

Dated: July 29, 2015

UNITED STATES DISTRICT JUDGE

---

[7] The statements of other inmates from 2014 is not probative on the issue of whether Drumgo was unconstitutionally searched in 2011. *See supra* note 4.

13